157 So. 385

## GROUNDS v. LOUISIANA HIGHWAY COMMISSION.

### No. 32775.

Oct. 29, 1934.

See, also, 177 La. 83, 147 So. 506.

Lewis L. Morgan, of Covington, for appellant.

Murff & Perkins and Melvin F. Johnson, both of Shreveport, for appellee.

LAND, Justice.

Plaintiff, as the owner of a plantation in Bossier parish lying just north of the Shreveport-Minden highway, known as route No. 80, has brought the present suit for damages for loss of his crops of alfalfa and cotton, caused by an overflow in 1930.

Plaintiff alleges that there are a number of bayous along this highway between Shreveport and Red Chute, across which the highway passes, and that the Louisiana highway commission, in remodeling and paving this highway in 1929 and 1930, instead of providing sufficient bridges across these bayous, tore out the bridges which had been built by the police jury of Bossier parish, and filled in these bayous with dirt, leaving inadequate culverts to take off the water that naturally passed through these bayous, thereby causing the waters to back up and overflow his lands.

Judgment was rendered in favor of plaintiff in the sum of $3,470, and plaintiff has answered the appeal and prays for an increase of the judgment to $12,000.

1. In Connolly v. Louisiana Highway Commission, 177 La. 78, 147 So. 505, it was held by this court, as stated in the syllabus of that case, that the "state highway commission is liable for damages from destruction of crops on land overflowed because of inadequate culverts installed in constructing highway."

There are then only two facts to be established in order to recover:

First. Did the defendant, Louisiana highway commission, in remodeling and paving this highway along this route, fill in the natural bayous over which it passed to such an extent as to cause the water that would pass off through these bayous unimpeded to back up and overflow the lands of plaintiff?

Second. If so, then, to what extent were plaintiff's crops damaged?

Plaintiff has filed in evidence a map showing the location of the Shreveport-Minden highway and the bayous over which it passes.

The estimate of the natural water passage of these bayous and the flow left by the highway commission is as follows:

| | |
|---|---|
| The natural water passage of Cross Bayou | 576 sq. ft. |
| The natural water passage of Alligator Bayou | 410 sq. ft. |
| The natural water passage of Little Mussell Shell | 750 sq. ft. |
| The natural water passage of Bayou at "E" | 350 sq. ft. |
| Making a total natural overflow, leaving out the canal which was not changed, of | 2,086 sq. ft. |

The openings left by the highway commission are as follows:

| | |
|---|---|
| At Cross Bayou | 50 sq. ft. |
| At Alligator Bayou | 3 sq. ft. |
| At Little Mussell Shell | 512 sq. ft. |
| At Bayou "E" | 000 sq. ft. |
| Making total opening left by the Highway Commission | 565 sq. ft. |

The total opening of 565 square feet, deducted from the original opening of 2,086 square feet, leaves 1,521 square feet, showing a congestion of practically 73% of the natural outlet. In other words, the highway commission left 565 square feet of opening to take care of 2,086 square feet of natural water passage.

Running down through sections 12, 13, and 24, as per map filed in evidence by plaintiff, there is a heavy line drawn by the engineer, Mr. Dutton, dividing the drainage district lying east of this line to Red Chute and the drainage district lying west of this line to Red river. The drainage district on the east carries off practically all the overflow water east of this line or elevation, and the drain-

age district on the west drains only the local lands through this territory, and requires nothing like as much drainage as it does on the east side of the separation line. There is an elevation of the territory just west of the separation line near Robinson's store over which the water has never been able to flow.

It is apparent, therefore, that plaintiff's lands which are west of the separation line could not be affected by the high waters in the drainage district east of the line, unless through the back water coming out of and through Little Mussell bayou across a low place, some distance north and entering into Cross bayou at point on the map marked "F" and "G," which would come on down through the territory just west of this elevated land.

There had never been an overflow west of Robinson's store for the last thirty or forty years, as far back as witnesses could testify, until 1922, when Kirby dammed up Cross bayou.

When that was blown out, there were no more overflows until the highway commission stopped up Cross bayou, Alligator bayou, and Mussell Shell in 1929 and 1930, eight years later.

Since these bayous have been stopped up, plaintiff has had three overflows in four years, 1930, 1931, and 1933.

The statements of various witnesses for defendant about the high water on both sides of the highway in 1919, 1922, 1927, and 1930 apply to the territory east of the high ground or Robinson's store, which was an elevated section of the country running north and south across the highway at that point.

This state of facts clearly shows that the stopping up of these bayous caused these overflows. The lower court arrived at the same conclusion, after seeing and hearing the witnesses.

2. The main defense is that the overflow was not from the waters from bayous in the east drainage district, but was caused by overflow waters from Red river backing up and covering plaintiff's land.

The report of Mr. Cronk, the local weather man, shows that on May 18, 1930, the stage of the river was 26.7 and that there were 13 feet of bank at Shreveport, when the water was at its highest stage on plaintiff's land.

There is a levee all the way down to Gatlin's place, 30 miles below Shreveport. It was impossible for the water to back out of Red river until it reached the end of the levee at Gatlin's place, which was 31 miles below plaintiff's property, with a fall from plaintiff's place to Gatlin's of seven-tenths foot to the mile. Hence it would have required a perpendicular rise of 22 feet for the water to back up and overflow plaintiff's land from Loggy bayou below Gatlin's, and such a rise would have covered every housetop from Shreveport to Loggy bayou. We are not impressed, therefore, with the main defense urged in this case.

■■ 3. The last matter to be considered is as to the quantum of damages to be allowed.

Plaintiff had 500 acres planted in cotton. His lands were overflowed May 23, 1930, and the water receded about June 10th.

Plaintiff admits in his testimony that his crop was not a total loss. He testifies that he made 63 bales of cotton, which plaintiff's testimony clearly shows were not gathered from the replanted crop, but from the overflowed crop.

Mr. Van Hoose states, however, that he ginned about 80 bales for plaintiff, and that the market price of cotton in 1930 was between 10 and 11½ cents per pound. Tr. pp. 5, 6, 50, and 52.

Plaintiff replanted the cotton killed by the overflow, but distinctly testifies, "But it did not rain for two months, and it did not come up." Tr. pp. 5 and 6.

Plaintiff again repeated this testimony: "Q. I think that you have stated that you failed to get a stand afterwards?

"A. Yes, sir.

"Q. Didn't make a crop?

"A. No, sir." Tr. p. 16.

Plaintiff had previously testified as follows:

"Q. I will ask you how much of the land that was replanted, that you got any cotton off of?

"A. Some I did not pick at all.

"Q. Some you did not pick at all?

"A. Yes, sir."

"Q. Then as I understand you, that this crop of sixty three bales did not pay the subsequent expense that you went to to cultivate it?

"A. Yes, sir. It did not." Tr. p. 6.

In the face of plaintiff's direct and positive testimony, with reference to the replanting of the crop, "but it did not rain for two months, and it did not come up," the conclu-

sion is irresistible that the 80 bales of cotton ginned by Mr. Van Hoose in 1930 were gathered from the overflowed crop. This cotton brought anywhere between 10 and 11½ cents per pound, or anywhere, for an average 500-pound bale, between $50 and $57.50 per bale, or an average price of $53.-75 per bale. The 80 bales from the overflowed crop, therefore, were sold for $4,300.

According to plaintiff's own testimony, he ordinarily raised 230 to 240 bales on his 500-acre tract, or about a half bale of cotton to the acre. Tr. p. 5.

It is therefore apparent that the 80 bales made from the overflowed cotton represented the average production on 160 acres, leaving 340 acres of cotton killed by the overflow.

Plaintiff states in his testimony that he had only 40 acres not overflowed. Tr. p. 5.

As Mr. Van Hoose ginned 80 bales for plaintiff, this would be an average of 2 bales to the acre, or four times the usual production per acre claimed by plaintiff, and this cannot be the case.

At the time of the overflow, the cotton was 10 inches high, and the alfalfa on a 25-acre tract was from 1½ to 2 feet high, and was totally destroyed. We are dealing, therefore, with a case of damages to immature crops from overflow. Plaintiff claims as damages the reimbursement of the cost of cultivating these crops, and a rental of $10 per acre, as shown by estimate made by plaintiff in his brief at page 26 "A."

Mr. Van Hoose states, however, that he rented land adjoining plaintiff's, and of the same character, at $8.50 per acre. Tr. p. 47.

Plaintiff quotes from 17 C. J. p. 891: "When crops totally destroyed are so immature as to have no market value, but it is too late in the season to replant, cultivate and mature crops of the kind usually produced upon the land, the measure of damages may be rental or usable value of the land."

Plaintiff also cites Germann v. 557 Tire Co., 167 La. 579, 120 So. 13, to the effect that, "where plaintiff has suffered some damage because of defendant's fault, but cannot fix the exact amount thereof, the court must fix the quantum of such damages as best it can with the lights before it. * * * *"

Adopting plaintiff's method of calculation of damages used at page 26 "A" of his brief, and conforming same to the facts of this case as we find them, with the rental value of plaintiff's lands fixed at $8.50 per acre as testified to by Mr. Van Hoose, we have the following result:

| | | |
|---|---:|---:|
| To break 500 acres of cotton land @ $3.00 per acre.................. | $1,500.00 | |
| To disk and plant 500 acres of cotton land @ $2.00 per acre......... | 1,000.00 | |
| Seed for 500 acres of cotton land at two bushels per acre........... | 1,000.00 | |
| To chop and plant 500 acres of cotton land at $2.00 per acre......... | 1,000.00 | |
| To plant 25 acres in alfalfa @ $7.50 per acre and seed.................. | 187.50 | |
| Total loss on crop alone........ | $4,687.50 | |
| By credit of sale of 80 bales of overflowed cotton.................. | 4,300.00 | |
| Balance of loss.................. $ 387.50 | | $ 387.50 |
| To rental on 340 acres of overflowed cotton @ $8.50 per acre......................... | | 2,890.00 |
| To rental on 25 acres of alfalfa overflowed @ $8.50 per acre............................. | | 212.50 |
| Total Damages ......................... | | $3,490.00 |

The judgment rendered by the trial judge is for $3,470. He gave no written reasons, but we presume that he must have adopted the rental value of $8.50 per acre, as testified to by Mr. Van Hoose, and also the acreage of 340 as representing the overflowed cotton land, and credited the total loss of $4,687.50 with $4,300, the price of the 80 bales sold from the overflowed crop, and then added the rental value, as the difference between the damages at which we have arrived and the damages allowed plaintiff in the court below is only the sum of $20.

The judgment appealed from is therefore amended and increased from $3,470 to $3,490, and, as amended, is affirmed. Defendant is to pay all costs, including cost of appeal.